So we proceed to the last case on our docket for today, and that is United States of America v. Yafa. May I proceed?  Good afternoon now, Your Honors. Mark Furnish for Defendants Appellants Joshua and Jamie Yafa, and I've reserved five minutes for rebuttal if needed. Your Honors, this is a case where the district court countenance the government's misuse of expert testimony, overt and covert, in two principal ways. First, it allowed a designated law enforcement expert to construct a supposed model of typical pump-and-dump stock manipulation schemes, thereby bolstering the suspect credibility of the government's accomplice witnesses, channeling unexamined hearsay, and most critically, inviting conviction simply because the conduct imputed to the defendants allegedly fit the supposed model. Now, second, the district court allowed an undercover FBI agent to testify as an expert witness in lay witness clothing. That is, the court permitted the expert, the agent I should say, to pervasively mix factual assertions and precipient observations from personally investigating the office with sweeping opinions and conclusions based on general law enforcement experience. Now, this error in particular had severe consequences. For one, it enabled the government to evade expert notice, disclosure, and reliability scrutiny. For another, it allowed the agent to conflate firsthand knowledge of the case with extrapolations from his specialized background in training, the latter fortifying the former. So we've already held that there's a fine line between lay testimony and expert testimony. So, you know, taking that as our precedent, why does the admission of Durant's testimony here constitute plain error? Even if it's error, why is it plain? Well, the fine line is not fine in the context, the specific context at issue here, which is that of a law enforcement agent serving as both an expert, an unnoticed expert, and a precipient fact witness. That line is not fine at all. And it dates back to Freeman in 2007, and it dates back even further to Figueroa-Lopez in 1997, the very case that the Advisory Committee on the Federal Rules of Evidence cited in its commentary to the 2000 amendments to Federal Rule 702. So this court was actually the first court to recognize in this particular context, because there's a whole line of cases in the Second Circuit where I come from that grow out of Figueroa-Lopez. So this court has long recognized this distinction in the particular context at issue here. And why is that, Judge Thomas? Because law enforcement expertise conveys, as this court held in Webb, it carries a special aura of reliability and trustworthiness. So the bolstering concerns, especially where you have a case that's premised on turncoat accomplices with all the usual baggage they carry, the motives to fabricate, and it's laid out in our brief. This was some cast of characters that the government called in this particular case. And we're all familiar with them. The bolstering effect of this kind of testimony is not like what the court just held in Holmes, which is dry, scientific testimony. People, you know, at least before the last several years, they have a tendency to credit law enforcement testimony out of hand. Maybe that's changing now. Can I interject for a moment? Sure. I looked at Agent Duran's testimony, and much of it was case-specific related to describing, well, you may disagree, but phrases that came out of the case investigation. What are the areas of concern that you have where it crossed over into expert territory? I saw something at the very end of his testimony that was a bit of a summation, but was there anything else in particular? Or maybe you want to start with that. Well, in one of the prior arguments, Your Honor used the word disentangle. And disentangle is apt here because it's completely pervasive. I had a great deal of difficulty cataloging how it was all mixed together. And part of the problem is, and admittedly we didn't object properly to this, there was no foundation laid for it at the beginning of the testimony. And at the end, by the way, the prosecutor asks, how do you know all this? What are you basing it on? Because there's no special codes in the case. You know, an expert, an undercover who participates in the investigation can interpret codes, ambiguous words, and the like. Much of this stuff is straightforward. And he explains in great detail at the end rather than at the beginning, oh, I'm basing this on my 20 years or 30 years of doing this. First back east, then going to the agent school. And I've been doing this forever. And I've investigated myriad white-collar offenses in stock. So it's very, very difficult, Your Honor, to separate, to tease out where the fact ends and where the expertise begins. Excuse me. Let me ask you this. You know, being an agent, there's a certain amount of, I would assume, you know, having background experience in order to help inform the investigation itself. That doesn't always cross over into becoming an expert, does it? So what I think this is what Judge Thomas was getting at is it's a little bit difficult to take those things apart where it's permissible for a lay witness to rely on their background experiences in informing their investigation of the case versus getting into the expert terrain. So the case law from this court, many other courts, and the advisory committee notes themselves make clear that the issue is not the testimony but the basis of the knowledge. That's what distinguishes expert testimony from factual testimony. And here he told you. He told you in two paragraphs that I set forth in full in both the opening and reply briefs that the basis of his knowledge, all of the pages of testimony, the two days of testimony before, the basis of his knowledge was what he did before, not anything particular or unique to this case. So he's extrapolating from all his history to what's going on in this case. And by the way, he's also defining terms, particularized terms in statutory language connoting guilt, which I mentioned in passing in the briefs. That stuff's not coming from this case. If we take the premise that there is a model of a pump and dump scheme, which is a dubious premise, because both the designated expert, Tarwater, and the putative expert or the functional expert, Durant, admitted that these schemes take many different shapes and forms. And, you know, that underscores why it's critical to disclose this person as an expert so we can conduct the threshold reliability analysis. Why are we letting in a supposed model of how these schemes work when both persons propounding the model say, oh, by the way, there is no model. These things take many different shapes and forms. And that creates for a defendant a patch-20-sue-2 situation. But, you know, he did say, and I think it's probably reasonable for the district court to find, that Durant both described his long-running personal involvement in the investigation. Do you dispute that? No, I don't. Okay. And explained that his knowledge was based on prior investigations. It seems like the district court, you know, in light of everything that happened, was not unreasonable to conclude based on exchanges like the one regarding the Chinese wall that Durant grounded his interpretations on information gained during his investigation of this group, despite that he also had knowledge of pump and dump. Pump and dump schemes from prior experiences. So I guess the question becomes, why is this affecting his substantial rights, as Judge Thomas asked you, because I'm not quite sure you've made your case for that, because it seems that Durant did make clear to the jury that his interpretation of the Chinese wall, which may have played a role in a determination by the jury, that one of the office acted with deliberate ignorance by purposely shielding himself from aspects of the project scheme, stemmed from knowledge he gained during the investigation in question. It seems that that may be significant here for us to consider. So there are multiple ways in which this was concretely prejudicial, but I'll tell you what I deem to be the most significant one. You have to put yourself in the shoes of a lay juror who doesn't know, I mean, all the arguments here this morning were about stock fraud incredibly, but a lay juror isn't going to understand this stuff, and a lay juror isn't going to understand the difference between what the undercover agent personally observed and what he's extrapolating from his past experience. And that's why this circuit has a model jury instruction as to how to parse this testimony. But didn't the jury also hear from Volmer, who also interpreted the same conversation and many of the same phrases that Durant... From whom I didn't catch. Volmer, Mr. Volmer, V-O-L-M-E-R. Well, Volmer is literally a dirty rat in this case, and we... Well, I mean, whatever he is... But the jury had the testimony. The jury can evaluate this, but they heard the same thing from him, so I'm trying to figure out where is the substantial right... Well, he bolsters the testimony. As I said earlier, the law enforcement officer who's done this over and over and over again in case after case after case, the overwhelming temptation is to set aside the witness's interest, Volmer's, his credibility baggage, everything else that's wrong with him, his bias and motive, his cooperation, his motive to fabricate, and just trust the agent because he says, I've done this before, and this fits the pattern, everything I've seen and done, both as an undercover agent and otherwise. So even if Volmer had just testified to all the exact same things, in your view, there's no overcoming Durant's testimony because of his law enforcement background? I'm saying that Volmer, as an accomplice, provided sufficient evidence for the jury to convict, but a sufficiency of evidence analysis is distinct from prejudice and harmless error. The issue, and we have the burden on point two because it's plain error, the issue is whether it affected substantial rights, whether it was prejudicial. That's not sufficient. That's not a sufficiency claim. I'm not disputing that the jury can or cannot believe Volmer and the other snitches and convict on that basis alone. They can. The issue is whether these two experts, noticed and unnoticed, and what we contend are their excesses and improprieties, had a substantial injurious influence on the verdict or on defendant's substantial rights. Now, this expert testimony, think about this. Think about how this case unfolds because I've thought about it and it doesn't make any sense to me. They start, the second witness, they start with a model based on what, I get the name screwed up, but what the first expert, he constructs this model. And then they proceed to fit the defendant's conduct into the model and urge the jury to convict based on the resemblance, based on the match. That's not how we do things in a criminal case. We prove what the defendants did and then on its own merits, we prove why it was wrongful and why it was illegal. We convict somebody. Can I pause you? It's not uncommon for an expert in a criminal case to set out that model of modus operandi in a general sense. You just said a moment ago that these are very difficult, confusing cases for a jury to understand what in the world is pump and dump in the first place. And so you have an expert testimony testify as to what these general schemes are. And then you get into the specific evidence of the case. Why is that something we don't do? So there's a tension, respectfully, in this court's cases between the doctrines of modus operandi on the one hand, which they say is fine, and profile evidence on the other hand, which is not fine. And I've tried to figure out what the difference is between the two because it doesn't make much logical sense. And what I came up with in the opening brief was that modus operandi means it's okay to paint out a very general model of criminal activity, but that profile evidence, when it specifically comes, when it comes very, very close to the peculiar facts and crime and scenario of the case on trial, that that's problematic. That's what I've gleaned from this court's cases. I know you may not want to talk about sentencing, but I would like to talk about sentencing. You cite to the Third Circuit decision, United States v. Banks, for the proposition. I think that loss is unambiguous, and it was, therefore, improper. I think this is your argument for the district court to defer to the guidelines commentary during sentencing. But since Banks, the Third and Sixth, no, at least the Sixth Circuit and another circuit have reached the opposite conclusion, noting that the term loss has no one definition. So I'm just trying to figure out how we should proceed going forward here. Sure. There is definitely a split on it, and it's unlikely that the Supreme Court will ever resolve the split because the sentencing conviction fixed it by moving subsequently. We have an ex post facto problem here if we were to be resentenced under the new guideline, but they fixed it by moving the commentary into the text. What I think is important or maybe even dispositive on this point is the 28J letter that I submitted on January 28, alerting the court to this court's, and I guess it's non-presidential, subsequent decision in Barama. And that was issued on January 27, 2025, and it's exactly on point with my argument. And the quote is, because loss, as used in former guideline 2B1.1B1, was not so ambiguous as to allow for a gain that does not approximate the victim's loss, the district court reversibly erred in using Barama's gain as a substitute for PANW's loss without making any findings on the victim's loss. And as I went on to note in the letter, this case is pretty close. The judge found that there were clearly other open market losses to unidentified victims, but he didn't make any findings as to what those losses might have been, whether and how they related to or were caused by the conduct attributed to the office, and most vitally, whether and how the gains imputed to the office fairly approximated those presumed other open market losses. And your honors know, sort of tying into the cases we heard before, at sentencing in these stock fraud cases, you can often have these event studies that attribute the drop in the stock to other things than the defendant's misrepresentations. And even by the guideline's own commentary, it has to be the loss, the gain, whatever we're using as a proxy, it has to be approximately caused by the defendant's conduct. So just to be clear, what is it how you would like for us to proceed? That's a great question. Jamie Yoffa has been released from jail because of his good time credits. I would suggest that we revacate the sentences and remand for further proceedings consistent with the court's opinion and leave us to fight it out in the district court. The court's opinion in what case? In this case. In this case. The presumed forthcoming opinion. I mean, the court issues a mandate, there's a mandate rule. No, no, no. So what would we find at this point? That it was error or it wasn't error? Error. Why was it error, though? If we agree with the other circuits, not the Third Circuit, if we agree with the other circuits, why would it be error? Well, then if you agree with the other circuits, then Barama is wrongly decided. Is Barama an opinion? I'm sorry, is Barama an opinion or a mem dispo? I'm sorry, ma'am? Is Barama an opinion or a mem dispo? Yeah, I guess, yeah, it's a summary, what we call a summary order. So it's non-presidential. Yes, non-presidential. So, I mean, but non-presidential, it's still pretty persuasive. That court adopted in substance the rationale of banks. Otherwise, we wouldn't be talking about ambiguity, you know, we wouldn't be referring to ambiguity in the face of the guideline. And they're saying it's not so ambiguous as to allow resort to the very commentary at issue in this case, absent appropriate findings supporting the correlation between gain and loss in this case. Thank you. Okay. May it please the Court, Daniel Zip on behalf of the United States. Your Honor, starting with the sentencing issue, this court doesn't have to decide whether to weigh in on the banks versus the other circuit decision as to whether loss is ambiguous in the guidelines. And that's because the type of loss here, which is gain as a proxy for loss, fits into the definition of loss regardless of whether it's ambiguous or not. In other words, there is a distinction, which was the case in the Third Circuit, between intended loss and loss, which is ambiguous enough that the court has to go to the commentary because the average person, if someone was threatening to take their wallet but didn't actually do it, might not perceive that as loss if it's just the intended loss. But if it's gain as a proxy for loss, it just makes intuitive sense that if someone then took the money out of your wallet, you could count that and that would be the equivalent of the loss. And that's what the district court did in this case. It basically used the gains, which could calculate that the office earned from this case. But the district court was relying on the sentencing guidelines commentary in order to do so. And under Kaiser, it's not supposed to do that until it finds ambiguity first. That's correct, Your Honor. But still, there's not a reason to remand in this case. Even the recent Mem Dispo in Barama said that Castillo and the Keysore cases did not foreclose the use of gain as a proxy for loss, and the government should have an opportunity to demonstrate that below when it's set to back down. Here, even if the court referenced the guidelines, the fact remains that on the facts of this case, the loss necessarily translates or the gain necessarily translates into loss. Right, but again, I mean, the district court arguably shouldn't have gotten to the commentary at all. I mean, didn't it have to first find that the work was ambiguous? On what basis is it looking to the guideline or to the commentary? Well, I think at the time of sentencing, that was still the law in this circuit. The commentary was still fair game. But even if that is now error, there's no need to remand for resentencing in this case because of the nature of the fraud here. At one point during the recorded calls, Vollmer describes this as a story stock. So are you saying that we would then make the determination under Kaiser that this is ambiguous, so therefore going to gain in the commentary was appropriate, and then just letting the sentence remain? There's two ways, basically. That would be to wade into the circuit split and say, yes, we agree with the Fourth, Second, and Seventh Circuit that this is ambiguous, and the court was fine to use the commentary. The alternate route would be to say that even if it wasn't ambiguous, given the nature of the gain versus loss analysis in this case, the defendant's gain here still meets the unambiguous definition of loss. Right, but I guess what I wanted to explore, because it seems like we have a couple of options that I see, is we do the Kaiser analysis, or do we do what the Eleventh Circuit just did and said because of the amendment that was made, find that it was clarifying, and then apply gain at that point because it was a clarifying amendment? I don't know if you're familiar with the Eleventh Circuit's case. I'm not sure that I know that particular part, but I would agree with defense counsel. This has been changed in the sentencing guidelines, so it's not an issue that's likely to repeat as these cases sort of sunset, but I think the most straightforward way to decide it would say even if loss is not ambiguous, that on the facts of this case, there's no dispute that this company was worthless by the end. So it's not a case where there's sort of difficulty correlating what some people may have gained versus what some may have lost. All of the money that the defendants in this case gathered from the investing public is necessarily lost to the investing public because this was a worthless stock at the end and because they were selling a story that had no real value. But at the time, the guidelines did not define loss, right? And so set aside intended loss, even the notion of loss being defined as actual loss and that one could use gain as a proxy for it, is that something that's clear from the meaning of the phrase loss? We believe it is. This court has recognized that in Martin and sort of as a general principle of law. If you have a bag of marbles and two people take a marble each out of that bag, you can look at the marbles that people took and that's necessarily going to be lost from your bag and gained to them. It's sort of a straightforward analysis that doesn't really require a lot of… I guess what falls short in that analogy is you know exactly who the two people are who took the marble. And in this case, you had I think eight investors where you could attribute to their actual losses. But I take it the government's case is that there are other investors that they can't find who also suffered losses and so therefore we have to rely on gains to the defendants. So I guess I'm not seeing the analogy fit very well. In that analogy, the people left holding the marbles would be the Yafas and their co-defendants, right? So even if we don't know what happened to the rest of the bag and we can't analyze exactly how much was taken out of the bag, we can look at the two marbles that they're holding and say that's your gain and by definition it's loss from this bag. It's a sort of straightforward understanding of what the word loss means in this context that you can use others' gains at least in a case like this where all of the value was gone by the end. So you could just sort of look to what they took from the conspiracy and use that as a proxy for the loss amount. Turning to the substantive issues on the modus operandi, the district court was within its discretion in allowing Agent Tarwater to testify about the common scheme or the common characteristics of pump and dump schemes. His testimony was reliable because he had 15 years of experience working on these type of investigations, and this court has repeatedly approved of this type of testimony as it helps the jury to understand complex criminal activities and alerts them to the possibility that combinations of seemingly innocuous events may indicate criminal behavior. Likewise on the lay testimony, it wasn't plain error for the district court not to sua sponte strike Agent Durant's testimony as improper lay testimony. As Your Honor noted, we're on plain error review. This court has repeatedly recognized that the distinction between lay and expert opinion in this context is a fine one, and the defense has not met their burden of showing that this was so plain or even unidentified which portions of the 48 tapes that we play. They're actually saying meets the test. They at the very least haven't met the burden of showing that this is something that a court should have stepped in and sua sponte corrected on its own. We've got plenty of time left. I'm happy to answer additional questions. I have no other questions. Thank you. Thank you. You may come up for rebuttal. Oh, you did have a minute left. Quickly on the sentencing, which is all I'm going to focus on. In a plain meaning analysis, gain and loss are not the same thing. A loss is a deprivation and a gain is a benefit. And as I explained in the reply brief, this is why there are distinct forfeiture and restitution statutes. Forfeiture strips the defendant of his ill-gotten gains, whereas restitution compensates the victim for what they lost and they're different things. And if you look at it in the context of mail fraud, courts repeatedly hold that a deprivation without a contemplated harm, which is the loss, does not amount to mail fraud. If you look in the extortion context, a deprivation without an obtaining, and this is SECAR from the Supreme Court, doesn't rise to the level of extortion. And why is that? And this is reflected in the commentary itself. There has to be a causal connection between the deprivation and the harm. And there was no findings in the district court on that issue. And to Your Honor's point about the substantive change, and we have to remember that even if the court were to deem it clarifying, the guidelines are still advisory. So that's not going to be determinative here. The district court on remand is free to disagree with the guidelines on policy grounds, say the commentary is wrong, and I don't credit it, among others, some of the reasons that I just articulated here. There's not a necessary correlation between loss and gain, particularly in light of what I said in the opening argument. In sentencing all the time, we could get an event study to show, an event survey to show that the fraud wasn't the cause of the victim's alleged losses. Thanks very much. Thank you. I appreciate your oral argument presentations, Mr. Hernich, Mr. Zipp. I appreciate your being here. The case of United States of America v. Jamie Ioffe is now submitted. Thank you. All rise.
judges: MURGUIA, SANCHEZ, THOMAS